UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Carl Anderson and Tammy Anderson, | Case No. 21-CV-02088 (JMB/LIB) |
| Plaintiffs, | |
| v. | **ORDER** |
| United States of America | |
| Defendant. | |

Matthew L. Woods, Michael D. Reif, and Peter A. Schmit, Robins Kaplan LLP, Minneapolis, MN, for Plaintiffs Carl Anderson and Tammy Anderson.

David W. Fuller, Erin M. Secord, and Friedrich A. P. Siekert, United States Attorney's Office, Minneapolis, MN, for Defendant United States of America.

This matter is before the Court on Defendant United States of America's (United States) objection to Magistrate Judge Brisbois's order dated October 8, 2024 (October 8 Order) (Doc. No. 164), which granted Plaintiffs Carl Anderson's (Anderson) and Tammy Anderson's motion to amend the scheduling order for leave to designate a replacement expert (Doc. No. 116). For the reasons discussed below, the Court overrules the United States' objection and affirms the Magistrate Judge's October 8 Order.

## BACKGROUND

The factual background for this matter is clearly and precisely set forth in the October 8 Order and is incorporated here by reference. An abbreviated background is set forth below for purposes of resolving the pending objection.

In 2018, Anderson underwent paraesophageal hernia repair surgery at the Department of Veterans Affairs Center, after which he experienced medical complications. (*See* Doc. No. 1 [hereinafter "Compl."].)  In response to these complications, in 2019, Plaintiffs retained Daniel Tseng, M.D., a board-certified gastrointestinal surgeon, to provide expert testimony for an administrative tort claim filed against the U.S. Department of Veterans Affairs (VA).  (Doc. No. 120 [hereinafter "Woods Decl."] ¶ 2, Ex. A ¶¶ 1, 3; Compl. ¶ 6, Ex. A.)  That claim was denied.  (Compl. Ex. B.)

In September 2021, Plaintiffs sought judicial relief by filing their Complaint, which alleges claims against the VA pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2671-2680.  (*Id.* ¶ 4.)  Consistent with the requirements set forth in Minnesota Statute section 145.682, Plaintiffs attached to their Complaint an affidavit of expert review and identification of expert, which identified Tseng as the expert who had reviewed the file and concluded that the standard of care had been breached and caused damages.  (*Id.* Ex. C); *see* Minn. Stat. § 145.682.  Plaintiffs complied with the Magistrate Judge's scheduling orders and timely disclosed Tseng's expert report and supplemental report.  (Doc. No. 16 at 3–4; Woods Decl. ¶¶ 3–4, Exs. A, B.)  In November 2023, the United States deposed Tseng.  (Woods Decl. ¶ 5, Ex. C.)  Tseng's principal theory was that VA personnel compromised Anderson's left gastric artery during his hernia surgery, which led to severe complications.  (*Id.* Ex. A.)

In March 2024, the United States learned that Tseng was subject to disciplinary action at a hospital where he had privileges.  (Doc. No. 127 [hereinafter "Fuller Decl."] ¶ 1.)  The United States received information that suggested Tseng had known of this

2

disciplinary action before his deposition, yet he made no mention of it during his deposition. (*Id.* ¶¶ 1–2, Ex. A.) In April 2024, six weeks after learning of the disciplinary action, the United States shared the information it had obtained with Plaintiffs. (Woods Decl. ¶ 6, Ex. D; Fuller Decl. ¶ 1.) The United States sought discovery related to Tseng's underlying disciplinary action from Plaintiffs. (Woods Decl. ¶ 10.) It also sought discovery from the hospital and Tseng, who retained independent counsel, both of whom asserted peer-review privilege under state statutes and refused to provide additional details. (*Id.* Exs. F, G.)

In the following weeks, the United States challenged the assertion of privilege, and the parties engaged in discussions regarding this topic. (*Id.* Ex. K.) On July 23, Plaintiffs' counsel, in response to a question posed by the United States about whether Plaintiffs intended to continue relying on Tseng's opinion, stated that they had intended to continue with Tseng but were open to substituting a different expert to avoid expending resources litigating the peer-review privilege issue in light of the United States' ongoing challenge to that issue. (*Id.* Ex. L.) On July 26, the United States rejected that proposal. (*Id.* Ex. M.)

On August 1, Plaintiffs learned that the United States had contacted Tseng about its intent to file a motion to compel. (*Id.* ¶ 16.) Tseng's counsel informed Plaintiffs that Tseng was inclined to withdraw from serving as an expert given the ongoing dispute and, presumably, to moot the anticipated motion to compel subpoena. (*Id.*) Plaintiffs asked Tseng to reconsider his decision to withdraw, but on August 6, Tseng confirmed his withdrawal. (*Id.* Ex. N.) That same day, Plaintiffs informed the United States of the news

of Tseng's withdrawal and of their intent to file a motion to amend the scheduling order to allow for designation of a new expert. (*Id.* ¶ 17, Ex. X.)

On August 8, Plaintiffs filed a motion to amend the scheduling order for leave to designate a replacement expert. (Doc. No. 116.) The United States opposed the motion. (Doc. No. 150.) The Magistrate Judge held a hearing on the motion (Doc. No. 156) and on October 8, issued an order granting the motion, finding Plaintiffs had demonstrated good cause to designate a replacement expert provided certain conditions were met to reduce prejudice to the United States. (Doc. No. 162.) The United States now objects to that order. (Doc. No. 164.) Plaintiffs timely responded to the objection. (Doc. No. 168.)

## DISCUSSION

District courts review magistrate judge orders on non-dispositive pretrial matters with extreme deference. *Coons v. BNSF Ry. Co.*, 268 F. Supp. 3d 983, 991 (D. Minn. 2017). The Court will reverse such orders only when the magistrate judge's decision is clearly erroneous or contrary to law. *Id.*; *see* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn. L.R. 72.2(a)(3). A decision is "clearly erroneous" when "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Coons*, 268 F. Supp 3d at 991. A decision is "contrary to law" when it "fails to apply or misapplies pertinent statutes, case law or rules of procedure." *Id.*

The United States argues that the Magistrate Judge misapplied Federal Rule of Civil Procedure 16(b)(4)'s "good cause" standard and failed to apply Federal Rule of Civil Procedure 6(b)(1)(B)'s "excusable neglect" standard. (Doc. No. 164 at 4–9.) The Court addresses each of these arguments in turn.

4

**I.     GOOD CAUSE**

Courts have "broad discretion in establishing and enforcing deadlines and in maintaining compliance with discovery and pretrial orders." *In re Baycol Prod. Litig.*, 596 F.3d 884, 888 (8th Cir. 2010). A pretrial scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4); *see* D. Minn. L.R. 16.3(b). "The primary measure of good cause is the movant's diligence in attempting to meet the [scheduling] order's requirements." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716–17 (8th Cir. 2008) (quotation omitted); *see also* Fed. R. Civ. P. 16(b) advisory committee note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."). The Court may also consider prejudice to the nonmoving party resulting from the modification of the scheduling order. *Sherman*, 532 F.3d at 717.

**A.     Diligence**

The United States contends that the Magistrate Judge erred in assessing Plaintiffs' diligence. (Doc. No. 164 at 5–9.) The Court concludes that the Magistrate Judge's decision concerning Plaintiffs' diligence was not clearly erroneous or contrary to law.

In the October 8 Order, the Magistrate Judge determined the following: (1) Plaintiffs "bear no blame" for Tseng's withdrawal; (2) "[t]here is no indication that Plaintiffs fired Dr. Tseng as an attempt to swap out their experts to gain a better expert"; and (3) Plaintiffs did not know of Tseng's underlying disciplinary action until the United States brought it to their attention. (Doc. No. 162 at 9–10). These determinations, along with the conclusion that good cause exists to modify the scheduling order, are supported by the sworn

5

declaration (and attached exhibits) of Plaintiffs' lead counsel. Specifically, the declaration and exhibits show the following: (1) Plaintiffs discovered Tseng's underlying dispute in April 2024 when the United States informed them of it; (2) Plaintiffs contacted Tseng shortly thereafter and learned that he was represented by counsel with regard to the dispute and that his counsel considered the dispute subject to peer review privilege; (3) Plaintiffs responded to the United States' discovery request on the topic; (4) Plaintiffs still had no firsthand knowledge of the dispute as of June 2024; (5) Plaintiffs did not want Tseng to withdraw; and (6) Plaintiffs informed the United States of their intent to designate a replacement expert the same day that they learned of Tseng's withdrawal; and (7) Plaintiffs filed their motion two days later. (Woods Decl. ¶¶ 6, 10, 16, 17.) On this record, the Court discerns no error and concurs with the Magistrate Judge's decision.

### B. Prejudice

The United States also contends that the Magistrate Judge's restrictions on expert discovery are clearly erroneous because they do not sufficiently mitigate the prejudice that the United States believes it will experience. (Doc. No. 164 at 9–12.) For the following reasons, the Court disagrees.

First, although the United States worries that Plaintiffs will be "retooling" their case, the order sets various conditions to prevent Plaintiffs from changing course. (Doc. No. 162 at 12.) For instance, the expert's theory cannot go beyond Tseng's theory of liability or express an opinion that expands beyond the scope of Tseng's opinion. (*Id.* at 11 (stating that the expert cannot "offer any entirely new theories of breach of duty or causation beyond those previously offered by Dr. Tseng").) In addition, the expert must form an

6

independent opinion based on an independent review of the source materials. (*Id.*) Indeed, the expert is precluded from incorporating by reference any of Tseng's opinions, and the expert cannot rely on, or even possess, any expert reports from this case when drafting his opinion. (*Id.* at 11 n.7.) Finally, the Magistrate Judge also afforded the United States the opportunity to depose the expert at the location of its choosing and ordered Plaintiffs to pay the court reporter fees incurred during the deposition, the expert's travel costs, the opposing attorney's fees for the deposition (excluding fees incurred in preparing for and taking the new deposition), and reimburse the United States $8,812.50 (or twenty-five percent) of the total costs it has paid its rebuttal expert to date. (*Id.* at 12–13.)

Second, the United States mischaracterizes the Magistrate Judge's restrictions as "confusing" and "openly invite[ing] Plaintiffs to strengthen their case" without giving the United States the same opportunity.[1] (Doc. No. 164 at 9, 11, 12.) Contrary to the argument of the United States, the conditions are clear and limit the substitute expert's opinion to the scope *and* theory of Tseng's opinion. (Doc. No. 162 at 11, 11 n.8.)

Third, the Magistrate Judge ordered Plaintiffs to reimburse the United States twenty-five percent of the costs paid to its rebuttal expert. The United States argues that this amount is insufficient because 100 percent of the rebuttal expert's work was done in response to Tseng's opinion. (Doc. No. 164 at 11–12, 12 n.4.) The record does not contain evidence of the exact breakdown of costs incurred for the United States. (*See* Doc. No.

---

[1] This argument relies on language from the October 8 Order, but when read in context, the language simply explains, in general terms, how limiting the "scope" of an expert's testimony does not necessarily limit the expert's "theory." (Doc. No. 162 at 11 n.8.)

7

162 at 12–13.) Instead, the evidence before the Magistrate Judge included the statement that the United States had paid $35,250 to its rebuttal expert who had done "an independent review of thousands of pages of medical records . . . before drafting his own report responding to the theories of Dr. Tseng." (Doc. No. 150 at 11; Doc. No. 151 ¶ 2.) The rebuttal expert's prior "independent review of thousands of pages" is work that need not be repeated and that will be relevant to respond to the new expert's report.

Fourth and finally, the Court disagrees with the United States' speculation that the substitute expert is unable to form an independent opinion because Plaintiffs gave him copies of the previous reports. (Doc. No. 164 at 12–13.) Contrary to the United States' argument, Plaintiffs assured the Magistrate Judge that the substitute expert "articulated and formed opinions before he ever saw anything besides the medical records" and "will testify to that under oath." (Doc. No. 159 at 10–11.) Moreover, the Magistrate Judge ordered Plaintiffs to retrieve and sequester the previous reports, as well as any notes (*id.* at 31), and specifically explained that "the expert cannot rely on, or even possess, any expert reports from this case *when drafting his opinion*." (Doc. No. 162 at 11 n.7 (emphasis added)).

In sum, the Magistrate Judge considered the potential prejudice to the United States, as well as the Plaintiffs' diligence, and determined that any prejudice to the United States could be adequately mitigated by ordering various restrictions on expert discovery. (Doc. No. 162 at 10–13.) The Magistrate Judge did not commit clear error.

## II. EXCUSABLE NEGLECT

The United States contends that the Magistrate Judge should have also applied the "excusable neglect" standard, in addition to applying the "good cause" standard, because

8

Plaintiffs sought to modify the scheduling order after the expert-disclosure deadline had passed. (Doc. No. 164 at 4–5.) However, the caselaw that the United States cites in support of its contention is not binding on this Court, and the Court has been unable to find any precedent that requires the Court to apply the "excusable neglect" standard, on top of the "good cause" standard, in this context. In any event, assuming without deciding that the Court should apply the "excusable neglect" standard, the Court concludes that excusable neglect exists to warrant substitution of the expert in this matter.

"When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on a motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). "Excusable neglect is an elastic concept that empowers courts to accept, where appropriate, late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir. 2010) (quotation omitted). The determination of whether neglect is excusable "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* (quotation omitted). In making this determination, courts consider the following four factors: (1) the possibility of prejudice to the nonmoving party; (2) the length of the delay and possible impact of the delay on judicial proceedings; (3) the reason for delay, including whether the delay was within the moving party's reasonable control; and (4) whether the moving party acted in good faith. *Id.*

Under the first factor, as stated earlier, the Magistrate Judge properly weighed the possible prejudice to the United States and imposed various restrictions to minimize the

9

harm. (Doc. No. 162 at 10–12.) As to the second factor, the timing of Plaintiffs' request to designate a substitute expert is not ideal. However, the United States does not argue that Plaintiffs had reason to know of Tseng's underlying dispute prior to the scheduling orders' deadlines. Furthermore, upon learning of Tseng's withdrawal, Plaintiffs immediately informed the United States and filed their motion two days later. Designating a new expert will undoubtedly delay the case, but the restrictions imposed will minimize the delay and its impact. Moreover, the delay is warranted in light of the prejudice Plaintiffs would face absent substitution, given that their claims are "founded squarely on the medical opinions of Dr. Tseng," as the United States aptly points out. (Doc. No. 150 at 11.)

As to the third and fourth factors, Plaintiffs' request to modify the scheduling order results from an intervening circumstance beyond Plaintiffs' control: Tseng's unilateral withdrawal from serving as an expert. (*See* Woods Decl.) Plaintiffs were not aware of Tseng's disciplinary action before it was disclosed to them by the United States and, like the United States, upon learning of it, they reached out to Tseng to obtain more information about it but were told by his counsel that the matter was subject to peer-review privilege. (*Id.* ¶ 6.) Plaintiffs complied with the United States' discovery request on the topic, intended to move forward with Tseng as their expert, and asked him not to withdraw. (*Id.* ¶¶ 10, 16.) This evidence supports the finding that the delay was outside Plaintiffs' control and not done in bad faith or to gain tactical advantage.

In sum, the Court concludes that the Magistrate Judge did not commit clear error, but even he had, each of the four factors weighs in favor of finding that excusable neglect exists.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. The Magistrate Judge's Order (Doc. No. 162) is AFFIRMED; and

2. Defendant United States of America's Objection (Doc. No. 164) is OVERRULED.

Dated:  November 22, 2024                    */s/ Jeffrey M. Bryan*
                                             Judge Jeffrey M. Bryan
                                             United States District Court