## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Carl Anderson and Tammy Anderson,          File No. 21-CV-02088 (JMB/LIB)

          Plaintiffs,

v.                                          **ORDER**

United States of America,

          Defendant.

Matthew L. Woods, Peter A. Schmit, and Michael Reif, Robins Kaplan, Minneapolis, MN, for Plaintiffs Carl Anderson and Tammy Anderson.

David W. Fuller, United States Attorney's Office, Minneapolis, MN, for Defendant United States of America.

This matter is before the Court on Defendant United States of America's Motion to Dismiss or for Summary Judgment. (Doc. No. 179.) For the reasons explained below, the Court denies the motion.

### BACKGROUND AND STATEMENT OF UNDISPUTED FACTS

#### A.    The Parties

Plaintiff Carl Anderson served as an infantryman in the U.S. Army from 1975 to 1979. (Doc. No. 188-19 at 14; Doc. No. 188-27 at 1.) In 1979, he was honorably discharged after injuring his back during a training exercise. (Doc. No. 188-19 at 14.) In civilian life, Mr. Anderson worked as a warehouse storage worker until 1991 when he decided to live off a modest military pension. (*Id.*) In 1998, the Department of Veterans Affairs (VA) approved Mr. Anderson for service-connected disability status, and he has

1

not worked since that time.  (Doc. No. 188-2 at 6:25–7:7; Doc. No. 188-27 at 9.)  In May 2014, Mr. Anderson married Plaintiff Tammy Anderson.  (Doc. No. 188-3 at 15:16–18.) They lived together in Wrenshall, Minnesota.  (*See* Doc. No. 188-19 at 2, 5.)

Mr. Anderson had a history of hypertension, gastrointestinal reflux disorder, colon polyps, osteoarthritis, and other health issues.  (*Id.* at 8.)  He was also a lifelong smoker and had well-documented mental health, cognitive, and physical challenges.  (Doc. No. 185 ¶ 71; Doc. No. 185-17 at 1; Doc. No. 188-29 at 5; Doc. No. 188-2 at 9:19–10:4; Doc. No. 188-27 at 3–13.)  Despite these issues, Mr. Anderson enjoyed an active social life with friends and family before the events giving rise to this action.  (Doc. No. 188-19 at 14; Doc. No. 188-3 at 24:3–31:19, 75:17–82:3.)

In May 2017, upper gastrointestinal imaging revealed that Mr. Anderson had an eleven-centimeter hiatal hernia.  (Doc. No. 188-19 at 8.)  In August 2017, a barium contrast study revealed that Mr. Anderson's hiatal hernia had progressed to a paraesophageal hernia ("PEH").  (*Id.*)  Consequently, Mr. Anderson was scheduled for PEH repair surgery on April 25, 2018, with Dr. Archana Ramaswamy, an attending surgeon and Chief of Bariatric and Minimally Invasive Surgery at the VA Medical Center in Minneapolis, Minnesota (Minneapolis VA).  (*Id.*; Doc. No. 185 ¶ 4.)

At that time, Dr. Ramaswamy had performed hiatal hernia repair procedures approximately 1,000 times.  (Doc. No. 185 ¶ 4.)  She is a board-certified general surgeon with a sub-specialty in the foregut, meaning the stomach and other organs of the upper abdomen.  (Doc. No. 185 ¶ 3.)  She has practiced medicine for thirty years, worked at various hospitals and healthcare systems, and served on the faculty at multiple medical

schools. (*Id.*; Doc. No. 185-1; Doc. No. 186 ¶¶ 10, 11.) Dr. Ramaswamy has co-authored dozens of peer-reviewed articles on foregut surgery, presents regularly at national and international conferences on this topic, and is currently vice president of the Society of American Gastrointestinal and Endoscopic Surgeons (SAGES) and immediate past president of the American Hernia Society. (Doc. No. 185 ¶¶ 6, 7; Doc. No. 185-1; Doc. No. 186 ¶ 11.)

The Minneapolis VA had a contract with University of Minnesota Physicians (UMP) to provide on-call cardio-thoracic surgery services to veterans. (Doc. No. 180 ¶¶ 8–17; Doc. No. 180-1; Doc. No. 180-2.) That contract did not allow on-call thoracic surgeons to take concurrent call for other facilities. (Doc. No. 180-1 at 6–9.) During that time, the Minneapolis VA also contracted with North Memorial Ambulance Service (North Ambulance) to transport Minneapolis VA patients as necessary. (Doc. No. 180 ¶¶ 19–25; Doc. No. 180-3.)

### B.    Mr. Anderson's First Surgery: April 25, 2018

On April 25, 2018, Mr. Anderson presented for PEH repair surgery at the Minneapolis VA. (Doc. No. 185-3.) He gave informed consent for this surgery, acknowledging several risks, including the possibility of death or "damage to the stomach or nearby structures" that "may be discovered later." (Doc. No. 185-2 at 3.) Dr. Ramaswamy performed the PEH repair with a surgical team of three residents and, for part of the surgery, another foregut specialist named Dr. Elizabeth Colsen. (Doc. No. 185 ¶ 28.) At the beginning of the surgery, Mr. Anderson's "entire stomach [was] vol[v]ulized up in [his] chest." (Doc. No. 185-3 at 2.) His stomach had been noted as having a "tight

diaphragmatic pinch around the mid stomach" and, during the surgery, the surgical team found "tight adhesions at the level of the diaphragm." (*Id.*) Dr. Ramaswamy's also described of Mr. Anderson's hiatal hernia as having a "kind of hourglass location of the stomach . . . which was from really kind of scarred in and tight pinch at the level of the diaphragm." (Doc. No. 188-1 at 32:19–33:1.) These features made it difficult for Dr. Ramaswamy to dissect and reduce Mr. Anderson's stomach into its proper position within the abdomen. (Doc. No. 185-3 at 2–3.) Partway through the surgery, Dr. Ramaswamy converted from using robotic instrumentation to a laparoscopic approach "to obtain better tactile feedback." (*Id.* at 3.)

The surgical team was eventually able to complete the reduction and overall PEH repair. (Doc. No. 185 ¶ 30.) Dr. Ramaswamy then "performed careful inspection of the stomach," and "noted some serosal injuries," which were sewn over to reinforce. (Doc. No. 185-3 at 3.) Near the end of the surgery, Dr. Colsen assisted in placing a percutaneous endoscopic gastrostomy (PEG) tube into Mr. Anderson's stomach. (*Id.*; Doc. No. 181 ¶ 8.) The surgical team then took a "final look" all around the stomach. (Doc. No. 185-3 at 3.) Dr. Ramaswamy then closed and concluded the operation. (*Id.*) The surgery was "unusually long," lasting approximately eight hours. (Doc. No. 185 ¶ 30.) Mr. Anderson's blood loss from the surgery was 150 milliliters. (Doc. No. 185-3 at 11.)

### C.    Mr. Anderson's Second Surgery: April 26, 2018

The following day, April 26, 2018, Mr. Anderson was experiencing clinical deterioration. (Doc. No. 185 ¶ 34; Doc. No. 201-9 at 2–3.) Dr. Ramaswamy's progress notes reflect a "need to rule out major complications such as leak, gastric necrosis and acute

reherniation." (Doc. No. 201-9 at 3.) Later that day, Dr. Ramaswamy performed an emergency exploratory surgery, during which the surgical team examined Mr. Anderson's abdominal cavity and stomach wall. (Doc. No. 185-4.) The surgery revealed a leak in Mr. Anderson's stomach, which the surgical team repaired. (Doc. No. 183 ¶ 6; Doc. No. 185-4 at 3.) During the surgery, the team was not looking for Mr. Anderson's left gastric artery and Dr. Ramaswamy does not recall encountering the left gastric artery or observing evidence that the left gastric artery had been compromised. (Doc. No. 185 ¶ 35.)

### D.    Mr. Anderson's Third Surgery: April 27, 2018

The following day, April 27, 2018, Mr. Anderson's condition continued to worsen. (Doc. No. 185-7 at 1; Doc. No. 185 ¶ 44.) Based on concerning endoscopy findings, Dr. Ramaswamy decided to perform another exploratory surgery. (Doc. No. 185-7 at 1; Doc. No. 185 ¶ 45.) That surgery began at approximately 6:42 p.m. and revealed necrosis of the upper stomach and lower esophagus. (Doc. No. 185-7 at 1–2, 4; Doc. No. 185 ¶¶ 46, 48.) Based on Dr. Ramaswamy's observations during that surgery, she believed that Mr. Anderson likely required a thoracotomy to gain complete source control. (Doc. No. 181 ¶¶ 22–24; Doc. No. 185 ¶ 48.) She contacted Dr. Madhuri Rao, a thoracic surgeon serving as an on-call contractor for the Minneapolis VA. (Doc. No. 185 ¶ 49; Doc. No. 188-1 at 141:1–12; Doc. No. 189-1 at 19:1–5.) That night, Dr. Rao was also on call for the University of Minnesota's Fairview Hospital (the University hospital). (Doc. No. 189-1 at 46:12–47:1; Doc. No. 188-33 at 2; Doc. No. 188-34 at 1–2.) When Dr. Rao received the call, she was at the University hospital in the operating room performing a procedure with a co-surgeon. (Doc. No. 189-1 at 66:10–22, 68:12–18.) Based on the information

Dr. Ramaswamy communicated to Dr. Rao, Dr. Rao recommended that Mr. Anderson be transferred to the University hospital.  (Doc. No. 189-1 at 73:13–20; Doc. No. 185-7 at 2.)[1]

Dr. Ramaswamy then prepared Mr. Anderson for transfer by cutting across Mr. Anderson's mid-stomach, which separated the viable lower portion of his stomach from the necrotic upper portion.  (Doc. No. 185 ¶ 54; Doc. No. 181 ¶ 36; Doc. No. 189-1 at 129:17–21.)  Dr. Ramaswamy left the necrotic upper portion of the stomach in Mr. Anderson's body and left it connected to the necrotic esophagus.  (Doc. No. 181 ¶ 36; Doc. No. 185 ¶ 54; Doc. No. 185-7 at 2; Doc. No. 189-1 at 129:17–21, 131:18–19, 133:3–

---

[1] The parties dispute what roles Dr. Rao and Dr. Ramaswamy played in the decision to transfer Mr. Anderson, whether Dr. Rao would have been available to come to the Minneapolis VA if Mr. Anderson was not stable for transfer, and whether Dr. Ramaswamy followed the instruction Dr. Rao gave her regarding preparing Mr. Anderson for transfer. The Veteran's Health Administration's VHA Directive 1094, Intra-Facility Transfer Policy states, in part, that because "[t]he sending facility assumes full responsibility for the patient during travel . . . the sending institution has full responsibility for determining stability for transfer and the appropriate services needed to accomplish safe transfer."  (Doc. No. 188 ¶ 31; Doc. No. 188-26 at 5.)  The VA asserts both that it "does not contest" that it bore responsibility for determining Mr. Anderson's stability for transfer (Doc. No. 205 at 22 n.9), while at the same time arguing that Dr. Rao, as the on-call specialist bore more responsibility for any bad outcome.  (*Id.* at 21 (citing Doc. No. 188-8 at 45:20–46:1; Doc. No. 188-6 at 100:21–101:5).)  A VA contract discrepancy report reflects that Dr. Rao and her co-surgeon at the University hospital "made a decision to transfer [Mr. Anderson] to the University based exclusively on their interpretation clinical needs."  (Doc. No. 186-1 at 3.)  Dr. Rao testified, however, that she "did not make the decision to transfer" (Doc. No. 189-1 at 74:2–14) and only recommend that Mr. Anderson receive care at the University based on the information Dr. Ramaswamy was relaying to her.  (*Id.* at 73:5–20, 112:24–113:7.)  She further testified that it was common practice for her to "rely on the physician on the ground evaluating the patient" to resolve concerns about whether a patient was fit to be transferred and that there had been "no red flags or concerns raised."  (*Id.* at 89:12–23, 113:3–7.)  Dr. Rao also testified that she would have treated Mr. Anderson at the VA "if they had asked [her] to come in as the only option or as the best option for [Mr. Anderson] at the time."  (*Id.* at 72:22–73:4.)  The VA contract discrepancy report reflects that Dr. Rao was "unable to come to the VA, as she was also operating at the University.  (Doc. No. 186-1 at 3.)

6.)  Dr. Ramaswamy also deliberately cut Mr. Anderson's "lesser curve vessels."  (Doc. No. 185-7 at 2.)  Dr. Ramaswamy then sealed Mr. Anderson's open abdomen with a "temporary VAC [vacuum-assisted closure] dressing with perforated plastic."  (*Id.*; Doc. No. 185 ¶ 55; Doc. No. 181 ¶ 40.)[2]

### E.    Mr. Anderson's Transfer to Fairview Hospital

North Memorial transported Mr. Anderson to the University hospital.  During transport, North Memorial's oxygen monitoring equipment was not working, so Mr. Anderson's oxygen saturation levels during the ambulance ride were not recorded.  (Doc. No. 188-6 at 113:16–114:20; Doc. No. 188-35.)  Between the time Mr. Anderson left Minneapolis VA and the first recorded observation made at the University hospital, his condition declined.  (Doc. No. 188-8 at 50:21–51:1; Doc. No. 189 at 63:13–24; Doc. No. 188-6 at 102:9–17.)  One University hospital note states that "upon arrival" Mr. Anderson was "grey and moribund" and "in extremis."  (Doc. No. 188-38 at 5; Doc. No. 188-39 at 1.)  His oxygen saturation was in the 30% range (Doc. No. 188-38 at 50) and there was

---

[2] The parties dispute whether Mr. Anderson was stable for transfer.  Plaintiffs' expert opines that he was not stable for transfer because "he was hypo to normotensive requiring two vasopressors," "significantly compromised from a respiratory status . . . requiring peak expiratory pressure, high levels of fractional inspired oxygen," and because temporarily closing his abdomen "led to further respiratory compromise."  (*See* Doc. No. 188-7 at 205:21–206:21.)  He further opined that, at the time of transfer, Mr. Anderson had an SO2 of 91% with a FiO2 of 94.7% and a PEEP of 10, as well as bilateral large pleural effusions that had not been drained, and a peak inspiratory pressure elevated at 39, despite having an open abdomen with a temporary abdominal closure, and he was acidotic with a pH of 7.24.  (Doc. No. 188-14 at 17.)  On the other hand, the anesthesiology team believed that while Mr. Anderson was "critically ill" he was "stable for transfer." (Doc. No. 181 ¶¶ 31–35; Doc. No. 181 ¶¶ 12–17; Doc. No. 184 ¶¶ 10–15; Doc. No. 184-2.)  Dr. Ramaswamy states that she relied on the anesthesiology team's assessment of whether Mr. Anderson was stable when determining whether to transfer him.  (Doc. No. 185 ¶ 56.)

concern he had developed abdominal compartment syndrome. (Doc. No. 152:9–18; Doc. No. 188-8 at 49:5–16, 107:1–108.7.) Chest tubes were placed, and time was devoted to stabilizing Mr. Anderson before the operation, which had begun at the Minneapolis VA, could be resumed. (Doc. No. 188-38 at 5.) Mr. Anderson was brought into the operating room at the University hospital at 10:22 p.m. (Doc. No. 188-41 at 6.)

### F.    Mr. Anderson's First Surgery at Fairview: April 27, 2018

Because Mr. Anderson's condition had become grave, Dr. Rao was in damage control mode when she performed surgery the night of April 27, 2018. (Doc. No. 189-1 at 152:11–154:22.) Dr. Rao and her team performed an upper endoscopy, bilateral chest tube, reexplored the Minneapolis VA's exploratory laparotomy, partial gastrectomy and abdominal washout. (Doc. No. 188-39 at 1–2.) Although Mr. Anderson was transferred for the purpose of having a thoracic surgeon resect his necrotic esophagus, Dr. Rao chose to focus mostly on the stomach that night; she did not perform a thoracotomy and removed only that portion of the esophagus that she could see through an abdominal approach, and only incidentally to removing the necrotic proximal stomach. (Doc. No. 189-1 at 152:11–157:21.) Dr. Rao's main goal was to temporize the situation, and she planned to go back and perform further procedures later once Mr. Anderson was stable. (*Id*. at 157:22–158:21.) Mr. Anderson was admitted to the ICU and remained unstable after this first surgery at the University hospital. (*See* Doc. No. 188-39 at 2.)

### G.    Mr. Anderson's Follow-up Surgeries, Procedures, and After-effects

Two days later, on April 29, 2018, still at Fairview Hospital, Mr. Anderson underwent a surgery to remove more necrotic esophagus and chest washout. (*Id.* at 3.) The

8

pathology report from these first two procedures at Fairview indicates only a "stomach" specimen was collected on April 27, the night of the transfer, and a "distal esophagus" specimen was collected two days later on April 29. (Doc. No. 188-38 at 1–2.)

Over the next month, Mr. Anderson underwent many additional procedures at the University hospital. (Doc. No. 188-29 at 7.) Ultimately, a thoracotomy was performed on Mr. Anderson on May 15, 2018. (Doc. No. 188-44.) He underwent more than twelve surgeries to clean and remove additional necrotic tissue and perform washouts of his abdomen and chest cavity. (*Id.*; Doc. No. 188-37.) On May 31, 2018, he was transferred back to the Minneapolis VA after his condition had stabilized. (Doc. No. 188-29 at 1.) There, he experienced ongoing issues. (*Id.* at 5–6.) When Mr. Anderson was strong enough, he was transferred to the Minneapolis VA's Rehabilitation Unit for ongoing wound care, nutritional needs, and multiple other medical needs. (*See Id.* at 9.)

Since 2018, Mr. Anderson has been hospitalized numerous times for various issues. (Doc. No. 1-3 at 5; Doc. No. 1-4 at 3–8.) Since September 2022, Mr. Anderson has been seen regularly at St. Luke's Wound Care Center in Duluth, Minnesota where he undergoes weekly treatments for his open abdominal wound, which was never closed. (Doc. No. 188-3 at 50:22–51:20; Doc. No. 188-9 at 32:11–34:1, 103:4–104:12.)

## H.     Presentment of Administrative Claims

In March 2020, Plaintiffs submitted administrative claims to the VA pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, et seq. and 28 U.S.C. § 1346(b)(1). (Doc. No. 1-1; Doc. No. 188-19.) In support of their administrative claims, they retained an expert to provide testimony. (Doc. No. 120 ¶ 2; Doc. No. 120-1 ¶¶ 1, 3; Doc. No. 1

9

¶ 6.)  The claims were filed on Standard Form 95 and an attached addendum.  (*See* Doc. No. 188-19.)  On the form, Plaintiffs stated the "basis" for their claims as follows: "[o]n April 25, 2018, [Mr.] Anderson was admitted into the VA Medical Center in Minneapolis, Minnesota and underwent robotic paraesophageal hernia repair which was performed by [Dr. Ramaswamy].  During the surgery, Dr. Ramaswamy negligently transected a blood vessel near [Mr. Anderson]'s stomach.  That negligent cut directly caused necrosis which resulted in significant medical complications and [Mr. Anderson]'s current condition." (*Id.* at 2, 5.)  In the addendum, Plaintiffs stated additional facts.  (*Id.* at 8–19.)

The claims set forth Mr. Anderson's medical history, his need for PEH repair, and the PEH repair performed by Dr. Ramaswamy at the Minneapolis VA on April 25, including the length of the surgery and certain challenges she faced while performing the surgery.  (*Id.* at 8–9.)  The claims also set forth the medical complications that Mr. Anderson experienced following the PEH repair and the surgeries Dr. Ramaswamy performed to address those complications on April 26 and April 27.  (*Id.* at 9–10.)  The claims noted that, during the April 27 surgery, Dr. Ramaswamy discovered that the upper portion of Mr. Anderson's stomach was fully necrosed, but she "could not access the distal esophagus from the abdominal approach." (*Id.* at 10.)  Further, the claims explained that Dr. Ramaswamy consulted with a thoracic surgeon who recommended that Mr. Anderson be immediately transferred to the University hospital.  (*Id.*)  The claims also described how Mr. Anderson was transferred by ambulance with his abdomen open, sealed only by temporary VAC dressing with perforated plastic, and in a "critically ill" condition.  (*Id.* at 10–11.)  Mr. Anderson had "intravenous vasopressor medication infusing to keep his blood

pressure high enough to circulate blood and mechanical ventilation for oxygenation." (*Id.* at 10.)  During the transfer, Mr. Anderson became "hypoxic for an unknown period of time." (*Id.* at 11.)  According to the claims presented, when Anderson arrived at the University hospital, he was "at the point of death" (*id.*), and Dr. Rao then performed "an emergency partial gastrectomy" and "an emergency abdominal washout which removed the necrotic tissue in [Mr. Anderson's] upper stomach." (*Id.*)

Plaintiffs' claims also included their expert's general conclusion that "the care and treatment provided to Mr. Anderson by the [VA] departed from the accepted standards of medical practice." (*Id.* at 13.)  More specifically, the expert concluded "that Dr. Ramaswamy breached her duty of care to Mr. Anderson by negligently cutting vessels during her [PEH] repair, leading to Mr. Anderson's stomach ischemia." (*Id.*)  In support of this conclusion, he reasoned that because "the distal esophagus and upper part of the stomach are very well vascularized . . . Dr. Ramaswamy necessarily must have cut significant stomach blood vessels during her [PEH] repair operation." (*Id.*)  He further explained that "Dr. Ramaswamy's negligent cut causally led to Mr. Anderson's stomach ischemia" because no pre-existing stomach ischemia had been identified in Mr. Anderson and because "total proximal stomach necrosis from a cut would occur within 48 hours." (*Id.*)  Finally, Plaintiffs sought damages totaling $10,000,000. (*Id.* at 2, 5, 14–19.)  The VA denied Plaintiffs' claims.  (Doc. No. 1-2.)

## I.   This Action

In September 2021, Plaintiffs filed the Complaint, asserting claims under the FTCA that Defendant is vicariously liable for the medical negligence of Dr. Ramaswamy.  (Doc.

No. 1 ¶ 4.)[3]  Consistent with the requirements set forth in Minnesota Statute section 145.682, Plaintiffs attached to their Complaint an affidavit of expert review and identification of expert, identifying the same initial expert Plaintiffs had relied on in support of their administrative claim.  (*See* Doc. No. 1-3); *see also* Minn. Stat. § 145.682.

In particular, the Complaint lists the following two examples of Dr. Ramaswamy's negligence:

> I.    Dr. Ramaswamy's failure to maintain the integrity of Mr. Anderson's left gastric vessel while cutting scar tissue and pulling Mr. Anderson's stomach down into the abdomen during the procedure.
>
> II.   Dr. Ramaswamy's failure to remove necrotic tissue per the consulted thoracic surgeon's instructions and instead placing a temporary VAC dressing on Mr. Anderson before departure to Fairview.

(*Id.* ¶ 54.)  The Complaint also states that the negligence is not limited to these two examples, but it also includes the statements in the incorporated expert affidavit.  (*Id.* ¶¶ 54–56.)  The incorporated affidavit identifies negligence in Dr. Ramaswamy's failure to

---

[3] The FTCA provides an express waiver of the federal government's immunity for claims based on certain torts, including medical malpractice, committed by federal actors.  *United States v. Orleans*, 425 U.S. 807, 813 (1976).  The purpose of this waiver is "to compensate the victims of negligence in the conduct of governmental activities in circumstances like those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws."  *Bacon v. United States*, 810 F.2d 827, 828 (8th Cir. 1987) (quoting *Indian Towing Co. v. United States*, 350 U.S. 61, 68–69 (1955)).  The United States is the only proper defendant in an action asserting a FTCA claim.  *See, e.g.*, *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1004 (8th Cir. 1998); *see also* 28 U.S.C. § 2679 (noting that liability can arise only as a result of negligence on the part of government employees).  Under the FTCA, plaintiffs are entitled to a bench trial but not a jury trial, money damages are the only remedy, and punitive damages are prohibited.  28 U.S.C. §§ 2402, 2674.

maintain the integrity of Mr. Anderson's left gastric artery (Doc. No. 1-3 at ¶ 45 ("because Dr. Ramaswamy compromised Mr. Anderson's left gastric vessel during her paraesophageal hernia repair, Mr. Anderson's proximal stomach and lower esophagus suffered from ischemia and became necrotic")), in Dr. Ramaswamy's failure to remove necrotic tissue (*id.* ¶ 46 ("because Dr. Ramaswamy failed to immediately remove any necrotic tissue from Mr. Anderson's proximal stomach or lower esophagus, the necrosis went untreated during Mr. Anderson's transfer to Fairview")), and in Dr. Ramaswamy's transfer of Mr. Anderson in an unstable condition (*id.* ("[b]ecause the necrosis went untreated during Mr. Anderson's transfer to Fairview, it caused significant complications throughout Mr. Anderson's body, such as septic shock and hypoxia")).

Plaintiffs complied with the scheduling orders and timely disclosed the report and supplemental report of their initial expert, Dr. Daniel Tseng. (Doc. No. 16 at 3–4; Doc. No. 120-1; Doc. No. 120-2.) In August 2024, Plaintiffs moved to amend the scheduling order for leave to designate a replacement expert after Dr. Tseng unilaterally withdrew. (Doc. No. 116.) Defendant opposed this motion. (Doc. No. 150.) In October 2024, the Magistrate Judge granted Plaintiffs' motion, finding Plaintiffs had demonstrated good cause to designate a replacement expert provided certain conditions were met to minimize prejudice to Defendant. (Doc. No. 162.) For instance, the Order limited the replacement expert's opinion to the scope and theory of Plaintiffs' initial expert's opinion. (*Id.* at 11–12.) Defendant objected to that Order. (Doc. No. 164.) In November 2024, this Court overruled Defendant's objection and affirmed the Magistrate Judge's Order. (Doc. No. 169.) On December 20, 2024, Plaintiffs produced the report of their replacement expert,

13

Dr. Nikolai A. Bildzukewicz. Dr. Bildzukewicz offers an independent opinion that "more likely than not, Dr. Ramaswamy divided the left gastric artery" during the PEH repair on April 25 (Doc. No. 188-14 at 17), that she "failed to fully evaluate the extent of esophageal necrosis and perform an appropriate resection to achieve source control" during the April 27 surgery (*id.* at 18), and that she "failed to realize how critically ill, especially from a pulmonary standpoint, Mr. Anderson was prior to transfer . . . . and demonstrated poor judgment in transferring [him]" (*id.*).

### DISCUSSION

Plaintiffs argue that that Dr. Ramaswamy was negligent in the following three ways: (1) Dr. Ramaswamy failed to maintain the integrity of Mr. Anderson's left gastric artery during the PEH repair on April 25; (2) Dr. Ramaswamy failed to remove the necrotic tissue upon discovering it; and (3) Dr. Ramaswamy transferred Mr. Anderson when he was not stable for transfer on April 27.[4] (Doc. No. 199 at 28–9.) Defendant now moves to dismiss Plaintiffs' claims concerning the second and third theories for lack of subject matter jurisdiction. In addition, Defendant moves for summary judgment of Plaintiffs claims concerning all three theories. The Court first concludes that it has subject jurisdiction over

---

[4] Defendant refers to two theories of liability: one referred to as the "left-gastric-artery theory" (*e.g.* Doc. No. 193 at 25–28; Doc. No. 205 at 3), which corresponds to what Plaintiffs refer to as their first theory (*e.g.*, Doc. No. 199 at 28); and one referred to as "transfer-preparation theory" and "transfer-related theories" (*e.g.*, Doc. No. 193 at 26–27, 34–35; Doc No. 205 at 14), which corresponds to a combination of what Plaintiffs refer to as their second and third theories (*e.g.*, Doc. No. 199 at 29). Presumably, Defendant combined what Plaintiffs separately listed as their second and third theories because they are closely related. Given the applicable standard for Defendant's motion, however, the Court adopts Plaintiffs' framework and identifies three distinct theories.

claims regarding the second and third theories of liability.  The Court also concludes that the record presented contains questions of fact concerning each of the elements of medical malpractice regarding all three theories of liability.  Therefore, the Court denies Defendant's motion for summary judgment.

## I.   MOTION TO DISMISS

Defendant makes the following three arguments in support of their contention that the Court lacks jurisdiction to consider Plaintiffs claim regarding Dr. Ramaswamy's failure to remove necrotic tissue and decision to transfer Mr. Anderson: (1) Plaintiffs did not include these claims in the materials presented to the VA; (2) The contractor exception to the FTCA bars these claims; and (3) the discretionary function exception to the FTCA bars these claims.  None of these three arguments has merit.

### A.   Administrative Presentment

Before a court can exercise jurisdiction over an FTCA claim, the plaintiff must have filed an administrative claim with the appropriate federal agency.  28 U.S.C. § 2675(a); *Mader v. United States*, 654 F.3d 794, 798 (8th Cir. 2011) (en banc).  This administrative presentment requirement "serves a practical purpose—it provides federal agencies a fair opportunity to meaningfully consider, ascertain, adjust, determine, compromise, deny, or settle FTCA claims prior to suit."  *Mader*, 654 F.3d at 800–01.  Importantly, the requirement is not an onerous one, and courts "liberally construe an administrative charge for exhaustion of remedies purposes."  *Allen v. United States*, 590 F.3d 541, 544 (8th Cir. 2009) (quotation omitted); *see Dynamic Image Tech. v. United States*, 221 F.3d 34, 40 (1st Cir. 2000) (explaining that the test under section 2675 "is an eminently pragmatic one: as

long as the language of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement"); *see also Estate v. Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 853–54 (10th Cir. 2005) (cautioning against interpreting the FTCA's notice requirement inflexibly).

A claimant properly presents their claim under section 2675 where the claim includes "(1) sufficient information for the agency to investigate the claims, . . . and (2) the amount of damages sought . . . ." *Farmers State Sav. Bank v. Farmers Home Admin.*, 866 F.2d 276, 277 (8th Cir. 1989) (citations omitted) (collecting cases). Courts in this Circuit have interpreted section 2675 to require notice of the facts and circumstances underlying the claim rather than the exact grounds upon which the claimant seeks to hold Defendant liable. *See Edwards v. United States*, 57 F. Supp. 3d 938, 949 (D. Minn. 2014) ("[I]n order to properly exhaust a claim for the purposes of the FTCA, a plaintiff need only present in her administrative claim the facts that would enable a legally trained reader to anticipate the legal theories that could be presented on account of those allegations."); *White v. United States*, No. 11-CV-5058 (JLV), 2014 WL 4782855, at *2 (D.S.D. Sep. 25, 2014) (quoting *FGS Constructors, Inc. v. Carlow*, 823 F. Supp. 1508, 1513 (D.S.D. 1993), *aff'd in part, rev'd on other grounds*, 64 F.3d 794, 804 (8th Cir. 2011)) ("A plaintiff's administrative claim need only 'fairly apprise[] Defendant of the facts leading to the claimant's injury . . . new theories of why those facts constitute tortious conduct can be included in a federal court complaint.'"); *see, e.g.*, *Estate of Lewis by Lewis v. United States*, No. 3-04-CV-00141, 2006 WL 8436536, at *4–5 (S.D. Iowa. July 17, 2006) (retaining jurisdiction and

16

declining to grant summary judgment because plaintiff's new allegations of negligence were not so distinct from allegations in her administrative claim, placed defendants on notice of the claim, and satisfied the statute's "pragmatic" goal); *Hartmann v. United States*, No. 10-4014-CV-C-NKL, 2011 WL 1542102, at *10 (W.D. Mo. Apr. 22, 2011) ("By setting forth the basic material facts, claimants provide sufficient information for the agency to investigate their claims.").

Here, there is no dispute that Plaintiffs' claims included the amount of damages they sought. The only contested question, then, is whether the claims presented to the VA included a claim that Dr. Ramaswamy failed to remove necrotic tissue and a claim that Mr. Anderson was too unstable for transfer. The Court concludes that, contrary to Defendant's argument, the information provided to the VA was more than sufficient for "a legally trained reader," *see Edwards*, 57 F. Supp. 3d at 949, to have "a fair opportunity to meaningfully consider, ascertain, adjust, determine, compromise, deny, or settle FTCA claims prior to suit," *Mader*, 654 F.3d at 800–01.

In their administrative claims, Plaintiffs alleged that the care Mr. Anderson received at the VA departed from the accepted standards of medical practice, and Plaintiffs specifically set forth facts surrounding the care Mr. Anderson received on April 27. (*See* Doc. No. 188-19 at 9–10.) Plaintiffs specifically alleged that Dr. Ramaswamy discovered necrotic tissue in Mr. Anderson's upper stomach, determined that she could not perform the procedure needed to remove necrotic tissue, consulted with Dr. Rao who recommended transfer, and ultimately decided to transfer Mr. Anderson to the University hospital with an open abdomen and in critical condition. (*Id.*) The facts also included Mr. Anderson's

arrival at the hospital at the point of death and Dr. Rao's performance of a surgery to remove the necrotic tissue in Mr. Anderson's upper stomach upon arrival. (*Id.*) These factual allegations were sufficient to allow the VA to meaningfully consider and investigate the medical malpractice claims against it prior to suit, including claims of malpractice in any decisions to provide medical care regarding the necrotic tissue that Dr. Ramaswamy discovered in Mr. Anderson's stomach and regarding his condition before transfer. *See Mader*, 654 F.3d at 800–01; *see also Edwards*, 57 F. Supp. 3d at 949, *White*, 2014 WL 4782855, at *2; *Hartmann*, 2011 WL 1542102, at *10. Thus, the Court has jurisdiction over Plaintiffs' claim of medical malpractice concerning the failure to remove necrotic tissue from Mr. Anderson and the decision to transfer him despite unstable condition.

### B.    Contractor Exception

Next, Defendant contends that the Court does not have subject matter jurisdiction over Plaintiffs' claims brought under their second and third theories because those claims properly lie against government contractors who were excepted from liability. (Doc. No. 193 at 4, 44–47.) Contrary to this argument, however, the Court concludes that the contract exception does not bar Plaintiffs' claims under these two theories.

The FTCA applies to negligent or wrongful acts or omissions of "any employee of Defendant," 28 U.S.C. §1346(b)(1), but expressly excludes acts or omissions by "any contractor with the United States." 28 U.S.C. § 2671. Under this exclusion, plaintiffs cannot bring FTCA claims against government contractors.

Here, the parties agree that Dr. Ramaswamy was employed by the VA and that Dr. Rao and North Ambulance were government contractors when the events occurred.

Defendant argues that this exception bars Plaintiffs' claims brought under the second theory because Dr. Rao is the only tortfeasor at issue. (Doc. No. 193 at 4.) It further contends that Dr. Rao "had a medical and legal obligation to Mr. Anderson as soon as she took [Dr. Ramaswamy]'s call" and "[b]y failing to come to the VA" to treat Mr. Anderson became "the sole and superseding cause of Mr. Anderson's injuries." (Doc. No. 205 at 21; *see also* Doc. No. 193 (describing Dr. Rao's conduct as the "an intervening and superseding cause of Mr. Anderson's injuries").)[5] This argument is misplaced and mischaracterizes the allegations and claims in the complaint. Plaintiffs have only brought claims against Dr. Ramaswamy; Dr. Rao is not a defendant. Although Defendant acknowledges this in portions of its written submissions, Defendant nevertheless contends that Plaintiffs have "sued the wrong party" and that the contractor exception bars suit against Dr. Rao. (Doc. No. 193 at 1, 4 19, 46.) The Court is compelled to conclude that because Plaintiffs' claims only concern Dr. Ramaswamy, who is a government employee, the contractor exception cannot bar those claims. Any argument Defendant has regarding Dr. Rao's conduct is more appropriately brought as a defense to the elements of duty or causation.

### C.    Discretionary Function Exception

Finally, Defendant contends that the Court lacks jurisdiction over Plaintiffs' claims based on their second and third theories because, to the extent Dr. Ramaswamy played a

---

[5] Defendant appears to suggest that Dr. Ramaswamy no longer owed a duty of care to Mr. Anderson after she called Dr. Rao. Defendant, however, agrees that the VA bore responsibility for determining Mr. Anderson's stability for transfer. (Doc. No. 205 at 22 n.9.) In addition, the language of the Intra-Facility Transfer Policy suggests that the VA owed a duty of care up until the point of Mr. Anderson's arrival. (*See* Doc. No. 188-26 at 5 ("The sending facility assumes full responsibility for the patient during travel.").)

role in the transfer decision, the discretionary function exception applies. (Doc. No. 193 at 48–52.) The Court concludes that this exception does not apply.

Under the FTCA's discretionary function exception, Defendant retains sovereign immunity against claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of [Defendant], whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If this exception applies, "it is a jurisdictional bar to suit." *Walters v. United States*, 474 F.3d 1137, 1139 (8th Cir. 2007). Courts apply a two-step test to determine whether the case involves "a discretionary function or duty." *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991). Under the first step, courts consider whether the challenged conduct "involve[d] an element of judgment or choice." *Id.* at 322. Under the second step, courts consider whether the challenged conduct is "of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23. The exception is meant to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *Id.* at 323. "Where only professional, nongovernmental discretion is at issue, the discretionary function exception does not apply." *Lather v. Beadle Cnty.*, 879 F.2d 365, 368 (8th Cir. 1989); *see Collazo v. United States*, 850 F.2d 1, 3 (1st Cir. 1988); *Archambault v. United States*, 82 F. Supp. 3d 961, 965 (D.S.D. 2015) (finding plaintiff's claims against the United States were barred by the discretionary function exception because their claims challenged government policy decisions, such as staffing and operation, which courts should refrain from micromanaging).

20

"[T]he discretionary function exception is intended to shield [Defendant] from liability for the exercise of governmental discretion, not to shield [Defendant] from claims of garden-variety medical malpractice." *Sigman v. United States*, 217 F.3d 785, 795 (9th Cir. 2000); *see also Jackson v. Kelly*, 557 F.2d 735, 738 (10th Cir. 1977) ("[M]edical treatment by a government doctor does not necessarily involve governmental discretion."); *White v. United States*, 317 F.2d 13, 18 (4th Cir. 1963) ("We find no case in which . . . negligent custodial care [or] malpractice . . . has been exempted under the discretionary exemption doctrine."); *Carcamo-Lopez v. Does 1 through 20*, 865 F. Supp. 2d 736, 757 (W.D. Tex. 2011) (concluding that the exception "cannot mean that every choice between different methods of obtaining care is protected" because were that the case Defendant, "could never be liable for medical negligence under the FTCA"); *Stacy v. United States*, N. 19-CV-301, 2021 WL 3849673, at *3 (N.D. Ill. Aug. 27, 2011) (declining to interpret the discretionary function exception so broad that it "swallow[s] up medical decision-making") *Sledge v. U.S.*, 723 F. Supp. 2d 87, 92 n.6 (D.D.C. 2010) (reasoning that defendant likely could not argue that the discretionary function exception applies because "medical decisions made by government employees during the course of treatment involve professional discretionary decisions grounded in medical science, not governmental policy considerations"); K. Davis, *Administrative Law Treatise* § 25.08 at 403–04 (Supp. 1982) ("The physician at the veterans' hospital exercises professional discretion in deciding whether or not to operate; . . . he combines professional discretion with governmental discretion when he decides that budgetary restrictions require nonuse of an especially expensive treatment in absence of specified conditions.")

The parties appear to agree that the first step of the test is satisfied. Therefore, the only remaining question is whether the conduct that Plaintiffs challenge is "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. 315 at 322–23. Defendant argues that Dr. Ramaswamy's course of conduct was grounded in several public policy considerations. (Doc. No. 193 at 50–51.) However, these arguments mischaracterize Plaintiffs' claims, which only challenge Dr. Ramaswamy's professional, nongovernmental discretion related to Mr. Anderson's stability for transfer and whether to leave necrotic tissue in his body during transfer. Such medical decisions are not grounded in social, economic, and political policy and, therefore, are not "of the kind" that Congress intended to shield from judicial second guessing. To the extent that Dr. Ramaswamy weighed her ability to offer the needed care to Mr. Anderson against the treatment he would receive at the University hospital, those decisions are still grounded in Dr. Ramaswamy's medical or professional judgments rather than the legislative and administrative decisions that this exception is meant to protect. Thus, this exception does not apply, and the Court is not barred from considering Plaintiffs' second theory on this ground.

## II.    MOTION FOR SUMMARY JUDGMENT

Defendant also moves for summary judgment in its favor. Because genuine questions of material fact remain concerning each of the three elements of Plaintiffs' negligence claim, the Court denies the motion.

### A.    Dr. Bildzukewicz's Expert Opinion Evidence

As a threshold matter, Defendant argues that the Court should disregard Dr. Bildzukewicz's expert report. Specifically, Defendant asserts that Plaintiffs violated the

Magistrate Judge's Order permitting designation of a replacement expert because Dr. Bildzukewicz's report expands the theories of liability articulated by Plaintiffs' initial expert. (Doc. No. 193 at 36–42.)[6]  The Court disagrees.

The Magistrate Judge's Order, which the Court affirmed (Doc. No. 169), limited the replacement expert's opinion to the scope and theory of Dr. Tseng's initial opinion. (Doc. No. 162 at 11–12.)  Dr. Tseng opined that Dr. Ramaswamy was negligent in the following three ways: by compromising Mr. Anderson's left gastric vessel during the PEH repair on April 25 (Doc. No. 188-17 ¶¶ 37, 38, 40, 44, 45); by failing to immediately remove necrotic tissue from Mr. Anderson's upper stomach or lower esophagus on April 27, despite having the capacity to do so (*id.* ¶¶ 39, 42, 46); and by transferring Mr. Anderson on April 27 in the state that he was in and without following Dr. Rao's instructions to "transect the distal stomach and mobilize the proximal stomach," which necessarily entailed removing necrotic tissue from Mr. Anderson's body before transfer to "prevent grave reactions throughout the body, such as septic shock" (*id.* ¶¶ 15, 39, 42, 46; *see also ee also* Doc. No. 188-18 ¶ 14 (disagreeing with Government's expert on the appropriateness of Dr. Ramaswamy's decision to transfer Mr. Anderson).)

---

[6] While Defendant makes passing reference to Federal Rule of Civil Procedure 37 when discussing the Declaration of Dr. Bildzukewicz (Doc. No. 200) and to Federal Rule of Evidence 702 (*see, e.g.*, Doc. No. 193 at 41–42), Defendant has not filed formal motions or made well-developed arguments under those rules to exclude Dr. Bildzukewicz's December 20, 2024 report.  Consequently, the Court declines to consider whether to exclude the report under Rules 37 and 702.  *See, e.g.*, *Shipp v. Arnold*, No. 4:18-CV-4017, 2020 WL 4006334, at *4 (W.D. Ark. July 15, 2020).

Dr. Bildzukewicz offers an independent opinion on these same three theories, as permitted.  (*See* Doc. No. 188-14 at 17–18.)  First, he opines that "more likely than not, Dr. Ramaswamy divided the left gastric artery" during the PEH repair on April 25.  (*Id.* at 17.)  Second, he opines that Dr. Ramaswamy "failed to fully evaluate the extent of esophageal necrosis and perform an appropriate resection to achieve source control" during the April 27 surgery.  (*Id.* at 18.)  Third, he opines that Dr. Ramaswamy "failed to realize how critically ill, especially from a pulmonary standpoint, Mr. Anderson was prior to transfer . . . . [and] demonstrated poor judgment in transferring [him] . . . ." (*Id.*)  The Court is therefore satisfied that Plaintiffs have not violated the orders that permitted them to designate a replacement expert, and that the replacement expert's report does not unfairly prejudice Defendant.  Moreover, to the extent Dr. Bildzukewicz's opinion exceeds the permissible scope under the Magistrate Judge's order, Plaintiffs have agreed to not offer those opinions at trial.  (Doc. No. 201 ¶¶ 6, 7; Doc. No. 201-5.)  Thus, Plaintiffs may rely on Dr. Bildzukewicz's report.

### B.    Summary Judgment Standard

Before addressing the parties' arguments, the Court observes that summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it affects the outcome of the suit, and a dispute is "genuine" if "a reasonable [fact finder] could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to

24

determine whether there is a genuine issue for trial." *Id.* at 249. In making this determination, courts view the evidence "in the light most favorable to the party opposing summary judgment." *Id.* at 261 n.2. This means courts resolve genuine disputes of fact in the nonmoving party's favor and give them the benefit of all reasonable inferences. *See Tolan v. Cotton*, 572 U.S. 650, 656, 660 (2014) (vacating and remanding because "the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party"); *see also White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). "Assessing the credibility of witnesses and evaluating the weight to assign to their testimony is the job of the fact-finder, and is not a function for the court on a motion for summary judgement." *United States v. Dico, Inc.*, 136 F.3d 572, 579 (8th Cir. 1998). Even in a non-jury case, courts cannot "treat summary judgement . . . like a bench trial by resolving factual disputes." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024–25 (8th Cir. 2021) (citation omitted). Credibility battles between experts are best left to the fact finder to decide. *See e.g., Ziesmer v. Hagen*, 785 F.3d 1223, 1238 (8th Cir. 2015) (explaining that where two experts had different versions of events, the weighing of this evidence "involves a credibility determination that is not appropriate at the summary judgement phase.")

### C.    Questions of Fact Regarding Each Element of the Claim

When viewed in the light most favorable to Plaintiffs, the record presented contains many questions of fact concerning the elements of the claim and each theory of negligence.

Plaintiffs asserting claims for medical malpractice in Minnesota must establish the following three elements: (1) the applicable standard of care; (2) the defendant's departure

from that standard of care; and (3) that the departure from the standard of care directly caused the patient's injury. *Becker v. Mayo Found.*, 737 N.W.2d 200, 216 (Minn. 2007).[7] To establish the first element, plaintiffs must establish, typically through presentation of expert opinion evidence, the "degree of skill and care possessed and exercised by practitioners engaged in the same type of practice under like circumstances." *Id.*, 737 N.W.2d at 216. The expert opinion evidence needs to identify "what particular measures a physician should take to avoid" injury. *See Anderson v. Rengachary*, 608 N.W.2d 843, 845, 848 (Minn. 2000). To establish the second element, the expert opinion evidence must also state how the defendant departed from the standard of care. *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 427 (Minn. 2002). To establish the third element, the expert opinion evidence must also outline the chain of causation between the defendant's alleged departure from the standard of care and the plaintiff's injury. *Id.*, 645 N.W.2d at 428. To prevail at the summary judgment stage, plaintiffs are not required to prove causation by evidence which excludes all other possible hypotheses as to the cause of the injuries, but need only "present[] sufficient testimony from which the [fact finder] can make reasonable inferences as to causation." *Cafferty v. Mille Lacs Health Sys.*, No. A20-0537, 2020 WL 7330307, at *6 (Minn. App. Dec. 14, 2020) (quoting *Schulz v. Feigal*, 142 N.W.2d 84, 89 (Minn. 1966)); *see also, e.g.*, *Rygwall v. ACR Homes, Inc.*, 6 N.W.3d 416, 434–35 (Minn. 2024) ("To show causation . . . the expert affidavit must include . . . enough information

---

[7] In actions brought under the FTCA, courts apply the substantive law of the state where the tort occurred. *Little White Man v. United States*, 446 F.3d 832, 835 (8th Cir. 2006) (citing 28 U.S.C. § 1346(b)). The conduct at issue in this case occurred in Minnesota.

about the specific case to reassure the court that the [fact finder] will have sufficient information to draw a reasonable inference—without speculating—that the provider's conduct caused the plaintiff's injury"); *Knuth v. Emergency Care Consultants, P.A.*, 644 N.W.2d 106, 111–12 (Minn. App. 2002). The expert opinion evidence "must provide [their] version of the 'how' and 'why' of causation." *Id.* at 438 (quoting *Teffeteller*, 645 N.W.2d at 429 n.4). Where competing causation theories are plausible, summary judgment is improper. *See Ingram v. Syverson*, 674 N.W.2d 233, 237–38 (Minn. App. 2004).

First, questions of fact remain concerning the standard of care. Plaintiffs' expert opines that it is always a violation of the standard of care when any of the left gastric vessels are cut during a hiatal hernia repair. (Doc. No. 188-8 at 13:18–22.) He also opines that the standard of care requires surgeons performing hiatal hernia repair to identify the left gastric artery and take steps to avoid injuring it. (*Id.* at 13:23–14:2; Doc. No. 188-14 at 12–13 ("identification of the left gastric artery can be difficult" and this artery "can be inadvertently injured or divided").) In his expert report, he also opines that the left gastric artery is "very susceptible to injury during a hiatal hernia repair" because it "will often 'hug' the right crus of the diaphragm" and that a surgeon "must be aware of this possibility and seek to identify the vessel and its course during dissection of the hiatus" to prevent injuring it. (Doc. No. 188-14 at 12.) In addition, Plaintiffs' expert opines that "[f]or a patient who is in septic shock secondary to necrotic tissue, it is absolutely imperative to resect or remove the necrotic tissue as quickly as possible (i.e., achieve source control)." (Doc. No. 188-14 at 16.) Plaintiffs' expert also articulates at least six separate parameters doctors should evaluate when assessing a patient's stability for transfer (Doc. No. 188-14

at 17) and opines that the treating physician "bears full responsibility" for assessing a patient's stability for transfer (Doc. No. 188-7 at 201:21–202:10, 205:16–25). Given these opinions and explanations, the record includes sufficient evidence to compel denial of Defendant's summary judgment motion as to the first element of proof.[8]

Second, questions of fact remain concerning whether Dr. Ramaswamy departed from the standard of care. Plaintiffs' offer indirect evidence that Mr. Anderson's left gastric artery was inadvertently compromised during his April 25 surgery and went unrecognized. For instance, Plaintiffs' expert opines that given the rare occurrence of gastric necrosis following PEH repair, the fact that Dr. Ramaswamy included "gastric necrosis" in her differential diagnosis suggests that she had a "high index of suspicion" that she may have divided the left gastric artery during Mr. Anderson's PEH repair. (Doc. No. 188-14 at 13; *see also* Doc. No. 185 ¶ 76; Doc. No. 188-1 at 180:22–181:3; Doc. No. 188-8 at 23:5–24:1, 114:22–115:20; Doc. No. 188-14 at 13; Doc. No. 201-9 at 3.)

Plaintiffs' expert also opines that "Mr. Anderson was at an increased risk of having unrecognized esophageal or stomach injury" due to "the prolonged operative time, the

---

[8] The bulk of Defendant's arguments do not relate to the standard of care, but whether Dr. Ramaswamy departed from the standard of care. For example, Defendant's expert agrees that the standard of care requires surgeons to avoid injury to the left gastric artery (Doc. No. 188-6 at 45:10–12; Doc. No. 188-12 at 3), but he believes PEH repair carries known risks of "mishaps" including the cutting of the left gastric artery. (Doc. No. 181 ¶ 15; Doc. No. 188-12 at 3.) Likewise, Defendant concedes that necrotic tissue "should be removed promptly to achieve source control and prevent toxins from spreading within the body" but not necessarily immediately. (Doc. No. 193 at 26.) To the extent that there are differences of opinion concerning the standard of care, such disputes are for the trier of fact to decide and are not properly resolved at this stage. In addition, as noted below, to the extent that the parties dispute whether Dr. Ramaswamy departed from the standard of care, those disputes are also best left to the trier of fact.

described difficult nature of the dissection, and the significant tension applied to the instrumentation to cause multiple serosal injuries."  (Doc. No. 188-14 at 14; *see also* Doc. No. 181-3 at 2 (describing how, at the time of surgery, Mr. Anderson had a "completely intrathoracic stomach with an inverted stomach" and" a tight diaphragmatic pinch around the mid stomach on endoscopy" and describing how, during the PEH repair, Dr. Ramaswamy was "unable to reduce [Mr. Anderson's] stomach from the thoracic cavity"), 3 (explaining that given the difficulties Dr. Ramaswamy encountered, she "converted from robotic to laparoscopic to obtain better tactile feedback"); Doc. No. 188-14 at 12 (explaining that "[i]f the hernia sac is very thick from chronic scarring and inflammation, or if there is significant abdominal fat, identification of the left gastric artery can be difficult"); Doc. No. 188-1 at 32:19–33:1 (describing the difficulty of the PEH repair because Mr. Anderson's hiatal hernia had a "kind of hourglass location of the stomach . . . which was from really kind of scarred in and tight pinch at the level of the diaphragm").)  In addition, the expert opines that the left gastric artery would likely have been positioned in such a way that it could be inadvertently injured and Dr. Ramaswamy stated that she was not paying very close attention to the artery during the PEH repair.  (Doc. No. 188-14 at 13; Doc. No. 188-1 at 101:10–15 ("I didn't pay very close attention to it because it is not part of my – the areas that I divide."); Doc. No. 188-8 at 39:6–41:3 (concluding that Dr. Ramaswamy "didn't pay close attention to the left gastric artery through the entire eight hours of the procedure"); Doc. No. 188-8 at 40:13–15 ("explaining that that "the left gastric is inevitably[,] for a big hernia[,] pulled up within the left chest"); Doc. No. 188-14 at 13 (opining that the left gastric artery "can be inadvertently injured or divided while trying to

dissect the hernia sac along the right crus or posteriorly near the decussation"); *see also* Doc. No. 188-14 at 13–14 (opining that the surgical clips noted on post-operative imaging further suggest that Dr. Ramaswamy divided the left gastric artery); Doc. No. 188-7 at 165:1–15 (same).)

Plaintiffs have identified evidence in the record indicating that Dr. Ramaswamy departed from the standard of care by not removing necrotic tissue from Mr. Anderson's body. (Doc. No. 185 ¶ 55 (statement of Dr. Ramaswamy acknowledging that she left the necrotic upper part of Mr. Anderson's stomach attached to the necrotic esophagus); Doc. No. 189-1 at 133:3–14 (deposition testimony of Dr. Rao's stating that she instructed Dr. Ramaswamy to "exclude or remove the necrotic portion" of Mr. Anderson's stomach), 155:1–11 (explaining that Dr. Rao removed necrotic tissue in Mr. Anderson's esophagus and the connected necrotic stomach tissue that was left in Mr. Anderson's body); Doc. No. 188-14 at 16 (opining that "[a]s a surgeon who is experienced in foregut surgery, Dr. Ramaswamy should be able to open the diaphragmatic hiatus and fully explore the extent of the necrosis" and that Dr. Ramaswamy's failure "to fully evaluate the esophageal necrosis" and "resect *all* of the necrotic tissue and achieve source control" fell below the standard of care (emphasis added)).)

Similarly, Plaintiffs identify evidence in the record that Dr. Ramaswamy departed from the standard of care because Mr. Anderson was not stable for transfer. (Doc. No. 188-14 at 17 (opining that Mr. Anderson was "clearly too unstable . . . to be transferred to another medical center" and observing that Mr. Anderson remained "critically ill on two vasopressors to maintain his blood pressure" and "intubated on the ventilator, with

significant oxygen and ventilatory requirements"); Doc. No. 188-7 at 205:21–206:13 (stating that Dr. Ramaswamy "transferred the patient in an unstable condition" because "he was hemodynamically unstable for transfer" and "significantly compromised from a respiratory status"); *see also* Doc. No. 201-10 at 2 (reporting that at 5:15 p.m. on April 27, 2018, Mr. Anderson was "now with hemodynamic instability, concern for gastric ischemia"); Doc. No. 201-3 at 2 (statement of a respiratory care practitioner concluding that Mr. Anderson could not be weaned off his ventilator, in part, because he was "hemodynamically unstable").)

Although Defendant cites evidence in the record that it believes contradicts the evidence identified by Plaintiffs, the standard applicable to summary judgment motions compels the Court to view the evidence in Plaintiffs' favor. Given the evidence identified by Plaintiffs, fact issues remain surrounding whether Dr. Ramaswamy diverted from the standard of care when she may have inadvertently compromised the left gastric artery, when she left the necrotic upper part of the stomach attached to the necrotic esophagus and when she permitted transfer of Mr. Anderson.

Finally, Plaintiffs also identify evidence in the record indicating that the departure from the standard of care directly caused Mr. Anderson's injury. Plaintiffs' expert report describes how and why Dr. Ramaswamy's conduct, decisions, and inaction created a chain of events that lead to Mr. Anderson arriving at the University "at the point of death." (Doc. No. 188-14 at 17–18.) Plaintiffs' expert opines that Dr. Ramaswamy more likely than not caused the gastric necrosis by compromising the left gastric artery during the PEH repair. (Doc. No. 188-8 at 46:5–48:8; Doc. No. 188-14 at 17.) She also "failed to fully evaluate

the extent of [Mr. Anderson's] esophageal necrosis and perform an appropriate resection to achieve source control." (Doc. No. 188-14 at 18.) She then "demonstrated poor judgment" by transferring Mr. Anderson when he was "too unstable for transfer" and was experiencing "significant respiratory compromise, as evidenced by large, undrained, bilateral pleural effusions, thus exposing him to a prolonged period of hypoxia and causing him to arrive at the University hospital in extremis." (Doc. No. 188-14 at 16, 18.) Plaintiffs' expert opines that "[a]ll of these were significant factors that proximately caused the substantial and continued disability of Mr. Carl Anderson starting in April of 2018." (*Id.* at 18.) This evidence is sufficient to create genuine questions of material fact concerning causation.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT Defendant United States of America's Motion to Dismiss or for Summary Judgment (Doc. No. 179) is DENIED.

Dated:  December 11, 2025

/s/ *Jeffrey M. Bryan*
Judge Jeffrey M. Bryan
United States District Court